We have four cases on the calendar this morning. Two government employee cases, one of which is being submitted on the briefs and not being argued. Two patent cases, one from the Patent Office, which is also being submitted on the briefs and not argued, and the second one from the District Court, which is being argued. The first case is a government employee case, Bruce Swinford v. Department of Transportation, 2010-3025. Mr. Holland. Thank you, Your Honor. Good morning. May it please the Court. My name is Jay Holland and I'm pleased this morning to represent, along with Ms. Gupta, Mr. Bruce Swinford. Mr. Swinford was a 33-year veteran of the federal government, who had worked in the Department of Transportation, who had received accolades through his career, including many awards, as the record reflects. Mr. Holland, we know the basic facts. All right, I'm going to get to the basic facts that are erred in the respect that we can reverse. I will do that, Your Honor. I'm going to narrow the issue for the Court. There's a lot of facts in this case, but there are some basic, undisputed facts that are the material, that shed light on the material issue, that give this Court the basis to reverse the MSPB. The issue that I want to address is the issue of the involuntary nature of Mr. Swinford's retirement, and whether or not the MSPB violated this Court's dictates from the case of Schultz v. United States. Well, didn't he say that he was going to retire if she, his boss, didn't take disciplinary action against him? No, Your Honor. What occurred, what's key here, is the fact that she told, and it's undisputed in the record, Ms. Weissman told Mr. Swinford that if he did not return to work while he was ill and sick, he would be placed on a wall and be subject to removal from the federal workforce. That's what this case boils down to, and that's what the case of Schultz discusses, exactly that issue. I understood you to have sort of three arrows in your quiver on the involuntary retirement. One, that your client was wrongly put on the PIP, and the wrongness of that compelled him to feel he should retire. You tell me if I'm wrong. Two, that he was wrongly denied sick leave when he was entitled to it. And third, that he was led to believe or was thought that unless he quit, he would lose the pay that he believed had been docked to him during a time he was on a wall. Those I understood to be the three arrows in your quiver. That's correct, Your Honor, but those all lead to the ultimate termination issue, the ultimate issue as to what would happen if Mr. Swinford did not comply with the request of his supervisor to return to work while he was sick. The undisputed record shows that on three occasions in writing can't be disputed by Ms. Weissman, that on August 5th, August 10th, and August 24th, in the record at 357, 360, and 365, she informs Mr. Swinford that if he does not return to work and does not satisfy her personally, which is what she put in writing, that he would be placed on a wall and subject to removal from the federal workforce. Satisfy her of what? Well, that's a good question. Satisfy her that she subjectively felt that his reasons for being absent were sufficient. Now, we need to be careful and accurate here, right? I agree. My understanding was that your client felt that the information that his doctor had supplied to the boss was sufficient to earn him, if you will, sick leave. Yes. And my understanding of the record was that the folks at the agency didn't feel that the explanation that your doctor had supplied was adequate in order to sustain sick leave, and they wanted further information as to why he would be unable to work, partly, I suppose, to determine whether or not there could be an accommodation or something like that. Yes, and that is what happened. He went to his doctor. If an employee feels, look, I have given the agency the correct information based on which they should give me sick leave, and they're just jerking me around. Yes. They're just jerking me around. Yes. And they're saying, you stay out, you're going to get fired. Yes. Well, in the vernacular of some of our cases, the employee is caught between the rock and the hard place. Exactly. The employee believes that he or she is being jerked around by an agency out to get him or whatever. So he has a tough choice. He can either quit or he can stand and fight. If you stand and fight, I'm just now talking about the doctor's explanation of this particular aspect of your case, sir. So if your client had said, look, my doc and I think we've given sufficient reason to earn sick leave and they're denying it, you stand and fight, you get a notice of removal, you petition to file your case at the MSPB and you say the agency was wrong. My doctor's explanation was adequate and I should win and they cannot remove me for that reason. Well, Your Honor, that's exactly what this court said in Shultz was coercive. But that type of putting a employee in that position who has a legitimate medical reason not to be at work is inherently coercive in the words of this court. But isn't that isn't the question whether or not aren't you sort of deciding the issue when you said that your client had a medically sufficient reason to earn sick pay and not have to be put on a wall? Well, that's exactly what happened in Shultz. In Shultz, the employee submitted a medical certificate here. In fact, our client submitted two letters from her doc from his doctor in Shultz. Ms. Shultz submitted a report that she was suffering from mental distress and needed 30 days off. The court said threatened with a charge of AWOL resulting from the improper denial of leave. Ms. Shultz's act of resignation must be found to be the result of coercion, not a voluntary act. With due respect to you and to us, we've read Shultz. Shultz has been around for a long time. Of the three arrows in your quiver for your involuntary retirement issue, wrongly put on the PIP, denied the sick leave, which we're just now talking about, and lose the pay, is this one issue we've been talking about sick leave what you feel would be your strongest argument? Yes, I do. Because you have here in that issue an issue that the court doesn't have to delve into what the court might otherwise be considered he said, she said, or disputed facts. It's not necessary. It's not necessary. It's not possible. I don't necessarily disagree with that. There are a lot of facts in this case. But in regard to this issue, it's not necessary to delve into those. Well, on the AWOL pay issue, it just seemed to me there was a kind of a logical disconnect. Because as I understood your client's argument, I feel that I'm compelled to quit. Because if I don't quit, I'm going to lose a couple of weeks worth of pay. But at the same time, your client had testified that on two occasions that he couldn't afford to retire because he had financial obligations going forward. So the notion that someone would trade future pay for two weeks of pay is irrational. Well, but there was no future pay. Because in her, in Ms. Weissman's very last letter on August 24th to my client, the day after it's undisputed that he met with Ms. Weissman and met with David Lewis, the HR director, where he was told that if he didn't return to work, he would be put on AWOL. That's the stand and fight issue. The next day, she sends him a letter on August 24th. That's not disputed. And in that letter, it's not disputed. She says, if you don't return to work, she says, I find your doctor's report insufficient. That's the denial of sick leave issue. That's the stand and fight issue. But that is the ultimate issue. That is where he finds himself on that day on August 24th. What would an objective, reasonable person believe their choices are? And I have to go back to Schultz, because it is on point. This court said removal for AWOL is not a legal possibility in light of a documented medical condition. Not a possibility. The court said, to answer your question, an agency is not required, of course, to indefinitely retain an employee on its roles who cannot work due to poor health. The proper procedure here would have been for agency to have granted leave, including leave without pay if necessary, and later to have removed Ms. Schultz for reasons of inability to perform the duties of her position. Or alternatively, for excessive absences, even though excused. Removal for AWOL, however, is not a possibility. That's what this court said. And that's the position that Ms. Weissman put Mr. Swinford in. It's exactly the Schultz situation. It's exactly the type of situation that this court said a federal employee does not have to stand, pat, and fight, because it is inherently coercive. He could sit and be fired, even though he has a legitimate letter. Go to A349 on the appendix. This is the letter from his doctor. It satisfies all the requirements of the CFR. It provides a diagnosis. It provides a prognosis. It provides the medications he's on. She's sick. What page was that again? That's appendix 349. Mr. Holland, you wanted to save five minutes. You're down to four. You can continue now or save it. I'll reserve my time for rebuttal, Your Honor. Thank you very much. All right. Ms. Vanderman. May it please the court. This is a classic case of substantial credible evidence. The administrative judge made numerous findings of fact based on evidence in the record. He found Mr. Swinsford's testimony not persuasive. We have supported our statement of facts with citations to the record, the testimony, the contemporaneous documents, the notes that Ms. Wiseman took throughout this. Well, Mr. Holland says he's entitled to victories almost as a matter of law on Schultz. Schultz, Your Honor, supports our case, not Mr. Swinsford's. In Schultz, there was a notarized letter from the doctor about the employee attesting that the employee was totally disabled for her position. Here. Are you suggesting that the notarized part is the distinguishing characteristic? Because I don't see how that would make any difference. Well, here in the first note that Mr. Swinsford's doctor sent him. Answer my question first. Are you suggesting the fact that it was notarized is a distinguishing characteristic? Notarized, yes, makes it more powerful because the doctor's letter here was very brief. It's further evidence that it's almost like an attestation under penalty of perjury. It's significant. Really? Well, the notarized makes it stronger. Notarized just means I witnessed you, so. Is that the Justice Department's position on a perjury statute? No, Your Honor, it's not. I wouldn't think so. Why don't you take that back in a hurry? All right. I will withdraw that. Sorry it came out of your mouth. The important point about Schultz is that the doctor said that the employee was totally disabled. Here, Mr. Swinsford's doctor, this letter is very brief. It did not address the four points that the OPM regulations require upon which Ms. Wiseman sent the letter. He actually said he recommended a month of rest and then try to work again. He did not say that Mr. Swinsford was totally disabled. He did not address the accommodations that the agency was willing to make and explain why, if at all, those accommodations would not work. He did not address whether there would be any risk of a sudden incapacitation of Mr. Swinsford at work, which is why in the August 24th letter that Ms. Wiseman sent, she said that the doctor's letter did not comply with her letter, which was based upon the regulations and which was based in part upon her continuous consultations with the chief of the human resources at the agency, Mr. Lewis. Are you saying that if Mr. Swinsford's doctor had supplied, say, on August 12th, a letter that had met the four points that were being requested by the boss, then this case would then fall under Schultz? Not necessarily because the agency would then have to consider what it was the doctor said. If other accommodations could have been made, that might have worked. If he had said, you know, because the doctor said he could attempt to work again in early September, based on the earlier note, you know, the agency would have to address the type of accommodations that the doctor said might work. Is there any evidence in this record that Mr. Swinsford supplied additional information from Dr. Howell or somebody else? None whatsoever. Any response to the August 24 letter from the boss saying your explanation isn't adequate? None whatsoever, Your Honor. On August 24th, he says that, and Mr. Lewis described this also, that he spoke with Mr. Lewis and Mr. Swinsford decided to retire in early September, and shortly thereafter, according to the testimony of Ms. Wiseman, he cleared out his office. He never returned to work. He never submitted any other medical documentation that the agency could consider. So it's your position that a reasonable employee, instead of quitting upon receiving the August 24th missive, would have instead gone back to the doctor and said, hey, beef up our explanation? Yes, that was certainly one of the options. This is unlike the case, for example, in Middleton. Middleton is a very strong case where the employee had clear medical evidence. The agency knew there was a very, very serious medical condition. He was based in Turkey and told to move his family back to the U.S. in 11 days. He was placed under immediate time pressure, which did not occur here. What do you mean it didn't occur here? He met with them on the 24th, and she said come back tomorrow or you're on AWOL status. How is that not immediate time pressure? Well, two points, Your Honor. One, he could stand pat and fight. Or two, he could go back to his doctor that day and get additional information. In fact, even though she had said she would charge him AWOL earlier in August, she never did except for the one day that he defied her instructions and refused to call her. Yeah, but the lawyer is pretty clear that she intends to do it starting tomorrow. She intends to do it so he might have a time to go back to his doctor. Instead, it appears that within he told Mr. Lewis on that day that he was going to retire, and he was going to retire in early September. The date was later changed to October. So he had plenty of time within which to consider, reconsider whether he was going to retire, supply additional medical information from the doctor if there was any, talk about what accommodations the agency might make. This is nowhere near the severity of the situation in Schultz or Middleton. Wait, so what happened on August 25th? He didn't show up at work. What happened then? He never came back to work. He was paid throughout that time until his retirement in early October, and because he had that sick leave, that five or six weeks. When did he announce he would be retiring? Yes, he told Mr. Lewis on August 24th that he was going to retire, and Mr. Lewis, the chief of HR. In this same meeting? Yes, when he met with Mr. Lewis. So he tells Mr. Lewis after he's been told if he doesn't get better medical evidence, he's going to get kicked out. He's told that if he retires, he'll be paid in the interim period. Is that what he's being told? That is not expressly in the record in terms of what he was told, but, in fact, he was paid. And what I'd like to point out is – I'm trying to get at this because, I mean, his argument is that he's in this no man's land period starting from the 24th going on. He thinks he's going to get fired. He thinks he's on a wall. He's not going to get any pay, and you're telling us that not only was he not put on leave without pay, he was put on leave with pay right down to the day that he retired. Right. He was never put on leave without pay. He was only put on a wall that's an absence without permission for one day. I understood that. And he never asked Ms. Wiseman at any point after that one day that he was charged a wall, he never called her on any day to say, am I on a wall today? Am I on a wall today? He never did that. A reasonable person would try to find out rather than do what he did. The key difference here is he's arguing that Mr. Lewis told him that it was a condition imposed upon him, that if you retire, I'll make sure you get paid for earlier in August. There's no evidence to that effect. And when he was testifying, Mr. Swinford. You say he did get paid? He did get paid. Yes, he got paid the whole time except for one day. And that's what Mr. Lewis was saying would happen if he quit. Mr. Lewis didn't address that. That's what I'm trying to say is that Mr. Swinford's storyline that there were these conditions imposed have no support in the record. The support in the record is what actually happened, right? And what happened, yes. He conceded that he would retire in response to the coercion as long as he got paid until his retirement, and then he actually got paid until his retirement, contrary to the letter, which indicated he would be put on AWOL status the next day. So why isn't that the evidence fully corroborating his story? There was no coercion, Your Honor, nothing in this record. Sure there was coercion. She said if you don't show up tomorrow, then you're going to go on AWOL status, and Schultz says that's coercive. Well, he had choices. There are a lot of things he could have done. He could have gone back to his doctor. He could have come back to work and tested out the accommodations that the agency offered. Wait a minute. The accommodations the agency offered were we have a medical facility in the building. If you feel you're experiencing any physical reaction as a result of your medical condition, you can go there. Well, his doctor is saying his blood pressure is 150 over 110. I can't even imagine blood pressure that high and that he is at risk for stroke or heart attack in light of this elevated blood pressure and that work increases his stress. So is he supposed to run to the medical facility while he's in the midst of the stroke, or is he somehow supposed to predict its coming and run to the medical facility? Your Honor, the blood pressure that the doctor reported was related to when Mr. Swinford was discussing his condition. The doctor also indicated all the medications that Mr. Swinford was on. His blood pressure went up to 150 over 110 just discussing his work problems. Well, imagine how much more it would go up when he's actually in the thralls of them. The doctor never really explained that or addressed this whole accommodation issue. He did. The effects of the stress at work disrupts his home life and endangers his well-being. The elevation of blood pressure increases his risk of stroke and heart attack. And the doctor did not address one of the four requirements. What are the risks of some sudden incapacitation? I mean, millions of people have high blood pressure. It increases his risk of stroke and heart attack. It does. It doesn't say by how much, whether there might be some sudden event, whether this is a longstanding issue. That's truism. I mean, everybody knows that elevated blood pressure increases the risk of stroke and heart attack. And the doctor recommended one month of rest, then attempt to work again. And in the August 5th note that the doctor sent in, the doctor's little note was recommending one month, return to work September 9th. On August 24th, when Mr. Swinford informed Mr. Lewis that he was going to retire and then later cleared out his office, he never addressed why he couldn't come back on September 9th. The doctor didn't address that. Well, the doctor said he needed a month of rest, hopefully to bring down his blood pressure. And so, you know, being away from the office would reduce the stress of the whole situation. You can start fresh. I know after a long weekend, I'm a better judge. That's correct. And then the doctor said try to work again. Right, on September 9th, not August 25th. The doctor didn't say, as in Schultz, that he was totally disabled for this position. The agency also offered some free stress management counseling. There's an employee assistance program. These were the accommodations. You can go to stress management classes. What are they, Tuesday nights from 7 to 9 or something? I don't know how that's going to help him the day he starts back at work. And then you can, if you feel sick, you can go to our medical facility on site. How are those accommodations to someone that is so stressed that they have this extremely high elevated blood pressure while they are on all of these low blood pressure medicines? He's registering this blood pressure while he's already on these medicines, according to the doctor's letter. Wow. Well, that's not much of an accommodation, is it? I mean, if his doctor says don't do it or you could have a heart attack, I mean, are you going to stay home or are you going to go into work and risk the heart attack? The doctor didn't say that. The doctor didn't say that the accommodations would not suffice. I think the accommodations are patently unreasonable to suffice. How could the accommodation being once a week stress management classes and you can go to the medical facility if you start feeling bad, how can that be an accommodation in light of the symptoms and evidence in his doctor's note? Well, Your Honor, there's no evidence in the record about the nature and extent of the employee assistance programs, but that was petitioner's burden to pursue if he, given the inadequacy of the doctor's letter. And it was petitioner's burden to come back with more information from the doctor as to why that might not work. We don't know what the, whether the, you know, again, the nature and extent of the accommodations, but it was his burden to show that they wouldn't work. Well, it's his burden to come back with all that, but it was on August 24th when he's in this meeting and he ended up having to agree to retire because otherwise the next day he would stop getting paid. No, well, that's where we dispute that there was any coercion. He had time even after August 24th. There's evidence in the record that... Well, he had already agreed to retire at that point. He had already made the concession that he would retire. He had told Ms. Wiseman in November of 03 that he intended to retire. He told Mr. Lewis he would retire. The agency set the wheels in motion to get the paperwork together. He signed them on August 30th. All the paperwork about his annuity retirement and the Braza case is instructive on that. He had the whole month of September to consider because the agency put off the retirement date. They couldn't process the paperwork that fast, and he got a substantial benefit. He got the within-grade increase because under the rating of record procedures, and that's in the record as we've explained, given that he never really worked under the performance improvement plan, he got the within-grade increase, which increased his annuity. So he got a lot of benefits out of it. It's one of the things I just don't understand. This man had sick leave. He's a federal employee. He's been a long-term federal employee. He's got multiple doctor's notes. He's got a blood pressure of 150 over 110. Why is he not entitled to take his sick leave? Why was his supervisor so determined to ride him the way she did? Your Honor, I disagree with the premise. She was not determined to ride him. There's no evidence whatsoever in the record of any motive. She was trying to get him to be productive. Well, the motive was she didn't think that he was a productive employee, that he wasn't adequately fulfilling his job duties. And if she had taken action for performance reasons, you know, in light of the record that she was busy creating, you know, we probably would affirm. You know, maybe we'd affirm on appeal on that basis, but that's not what we're here to decide. I mean, but that's clear. It's clear from the record that she thought that he was failing to fulfill his job duties in light of the PIP and all of that. But I don't understand. He's got sick leave. Why not let him use it? What's the problem? Because the regulations permit that if an employee is going to be out for more than three days, an employer manager is permitted to ask for medical documentation. And under a performance improvement plan especially, he was warned not to take unplanned leave. And in order to evaluate his performance under a PIP, you can't evaluate performance if he's refusing to perform. Is he refusing or is he sick? He's sick. He's got a doctor's note. Well, the doctor's note does not meet the four requirements of the regulations, did not meet. Which one didn't it meet? It didn't really. It meet the second, third, and fourth, which was. Tell me which one it didn't meet. It did not meet. Okay. It met number one, there was a diagnosis. It did not meet number two, the prognosis, which required an estimate of the expected date of full or partial recovery. Well, why not? They say he says he's going to take one month of rest and then come back to work after that. And he chose to retire instead. But one month, no. If you are following the facts, he didn't. He chose to retire because he was told he was going to be put on a wall. Let's focus on whether or not the letter meets each of these requirements. It did not meet number three because it said, explain the impact of the medical situation on his overall health, including any conclusion that accommodations are not warranted. So the doctor never addressed the accommodations issue. And the fourth one that was not met was, explain if the condition would indicate the likelihood that he may experience sudden or subtle incapacitation for work, with or without accommodations. It did not meet that, given that the doctor never related this condition to what Mr. Swinford's job responsibilities were. The effect of the stress is to disrupt and endanger his well-being. Elevated blood pressure is increased risk of stroke and heart attack. I mean, if he's going to have a stroke or heart attack, I think it's pretty clear he can't do his job under those circumstances. So why isn't that adequate? It's not adequate because it did not address at all the nature and type of work that Mr. Swinford did. There are some types of work you can do while having a heart attack? No, Your Honor. When Ms. Wiseman sent the letter to Mr. Swinford to give to his doctor, she also sent his physician description. And, for example, the doctor in Schultz said the employee was totally disabled for her position, relating why that employee was not able to perform the nature and functions of her particular job. So, for example, if the doctor had said, I understand that Mr. Swinford has been put on a PIP, which is like a very serious short-term testing period, and somebody who's on a PIP is probably a little more anxious about doing well than somebody who's not on a PIP. If the doctor had said, well, I think putting him back into the PIP environment will exacerbate his condition, are you saying that's what's missing? That sort of thing is missing? That sort of thing. At Appendix 214. But the agency knew he was on a PIP. I'm sorry? Why does the doctor need to tell the agency that, because the agency knows he's coming back, if he came back he'd come into this high-powered, very tense environment. The agency is entitled to a medical explanation, and Mr. Swinford testified at Appendix page 214 that he had been coasting ever since 1997. He really didn't have much work to do, even while he was challenging the PIP. Yeah, I think actually the records show that he hadn't, for several years, hadn't done anything. Close to nothing. And, you know, your blood pressure doesn't go up when you're coasting. That's correct, Your Honor. So essentially, you know, this case is not like Schultz's as. I guess I don't understand the fact that he hadn't done a lot of work in advance of the PIP and even his concession. What part does that play with regard to whether this letter adequately meets those four factors, which I still haven't seen you demonstrate to me which of the factors it's failing to satisfy. That did not go to the four factors. Our position is that the doctor's letter did not meet the second, third, and fourth elements of the regulations that was set forth in Ms. Wiseman's letter to Ms. Swinford. It did have a diagnosis, and that's about all it had. And it recommended that he try to work again, and he never tried. He just cleared out his office and left. So we respectfully request that the court affirm the decision of the board. Thank you, Ms. Vanneman. Mr. Holland has some rebuttal time. Thank you, Your Honors. Very briefly. What about the four factors in the letter? The letter doesn't discuss any accommodations. Couldn't Mr. Swinford have gone back and gotten more detail from his doctor in light of the accommodations that the agency was offering? Well, Your Honor, let's remember the timeline. Ms. Wiseman's letter was dated August 24th, not received until the earliest of the next day. Mr. Swinford's meeting with Ms. Wiseman and Mr. Lewis was on August 23rd. Her letter pointed out the inadequacies of the August 12th doctor's letter? Well, actually, she doesn't at all. The August 24th letter says nothing about what the inadequacies are. It doesn't say what additional information is needed. She just says she finds it insufficient. She says, please refer to my August 10th letter, which clearly references the medical documentation needed from your doctor to warrant any continued absences. You're not being candid. Her letter does, in fact, say where he can look to find out exactly what is needed. And her August 10th letter says one, two, three, four, bullet-pointed, indented, and everything. So by reference to her August 10th letter, she clearly says to him exactly what medical documentation is necessary. Right. And the doctor's August 12th letter complied with all of those points. In her follow-up… Where is the August 12th letter? A349, the doctor's letter. That's the doctor's letter. Right. So he complied. The doctor's not a lawyer. He's a family physician. He explained all the points Your Honor explained were the medical issues that Mr. Swinford was facing. He explained his diagnosis. He explained his prognosis. He explained the impact of his medical condition and what work would have on it and how long he needed off. It did exactly what was required by the regulation. Right. In Shultz, it appears she submitted far less. On point three, sir, you would have expected the doctor to have responded to the accommodation offered in the same tone that Judge Moore responded. Hey, this is inadequate. Well, he didn't… Mr. Swinford was entitled to take the letter of August 10th that he got to his doctor saying here's what I need from you, right? Well, that's exactly what he did. The August 12th letter is in response to the August 10th letter. And the doctor can't read because he doesn't respond to paragraph three. I believe he does, Your Honor. I believe he gives an explanation of the impact. The accommodations are not warranted, okay? Restrictions or accommodations. There were no accommodations offered at that time. That's my point, Your Honor. It wasn't until August 24th that Ms. Weissman even mentions the word accommodation, which Judge Moore already pointed out, what that offer was, which was you could go get some help at the health clinic if what? If you're having a stroke or a heart attack. That's not a choice. It's not an accommodation. There was no real accommodation offered. And in this very same breath, she states, as she already had twice before, uncontroverted, in writing, putting aside all the oral statements, that he would be put on AWOL. He already had been. We know he had been at least one day. But he would be put on AWOL the very next day if he didn't return to work. That's exactly the coercive tactic this court said is unacceptable in the face of a serious medical condition. And Schultz is exactly on point in that regard. This court said that's not a legal possibility. You can't do that. This is not an individual being faced simply with an unpleasant choice. This is the definition of a coercive forced retirement. With that, Your Honors, absent any further questions, we would ask that the court reverse the finding of the MSPB and reinstate Mr. Swinford. Thank you, Mr. Holm. Thank you very much. This has been taken under advisement.